UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DORIS MURRAH, on behalf of herself : Docket No.
and all others similarly situated, :
: **CLASS ACTION**
Plaintiff, : **COMPLAINT**
:
-against- : **JURY TRIAL**
: **DEMANDED**
:
FOREX CAPITAL MARKETS, LLC, FXCM :
HOLDINGS, LLC, GLOBAL BROKERAGE, INC., :
f/k/a FXCM, INC., DROR NIV, and WILLIAM :
AHDOUT, :
:
Defendants. :
:
-------------------------------------------------------------------X

Plaintiff Doris Murrah ("Plaintiff"), by her undersigned attorneys, as and for her Class

Action Complaint against the above-named defendants ("Defendants"), upon knowledge as to

matters relating to herself and upon information and belief[1] as to all other matters, alleges as

follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

and 1337 and 7 U.S.C. § 1 et seq.

2..     Venue is proper under 28 U.S.C. §§ 1391(a) and (b) and 7 U.S.C. § 25(c),

because a substantial part of the events or omissions giving rise to the claim occurred in this

District.

---

[1] Plaintiff's allegations on information and belief are based on the investigation of counsel, which includes a review of publicly-available news accounts, court filings, the Order Instituting Proceedings in In re Forex Capital Markets, LLC, CFTC Docket No. 17-09, and the Complaint in In re Forex Capital Markets, LLC, NFA Case No. 17-BCC-001.

## PARTIES

3. Plaintiff Doris Murrah ("Plaintiff") is a natural person residing in Atlanta, Georgia. Plaintiff maintained a forex trading account with FXCM (as further defined below) during the Class Period. Plaintiff and the Class (as defined below) have been damaged as a result of the unlawful course of conduct alleged herein, and Defendants have been unjustly enriched at their expense.

4. Defendant Forex Capital Markets, LLC ("FXCM") is a Delaware corporation having its principal place of business in New York, New York. At relevant times FXCM offered trading platforms for foreign currency contracts, was registered with the Commodity Futures Trading Commission ("CFTC") as a Futures Commission Merchant ("FCM") and Retail Foreign Exchange Dealer ("RFED"), and was provisionally registered with the CFTC as a Swap Dealer.

5. Defendant FXCM Holdings, LLC ("FXCM Holdings") is a Delaware corporation and is a holding company that at relevant times was the immediate corporate parent of FXCM.

6. Defendant Global Brokerage, Inc., f/k/a FXCM, Inc. ("Global") is a Delaware corporation having its principal place of business in New York, is a holding company whose sole asset is an equity interest in FXCM Holdings, and is the sole managing member of FXCM Holdings.

7. Defendant Dror Niv ("Niv") is a natural person residing in Connecticut, served as the Chief Executive Officer of FXCM at relevant times between 2009 and 2014, and has been registered with the CFTC as an Associated Person and listed as a Principal of FXCM at relevant times between 2001 and 2017.

8.  Defendant William Ahdout ("Ahdout") is a natural person residing in New York, served as a Managing Director of FXCM at relevant times between 2009 and 2014, was registered with the CFTC as an Associated Person of FXCM between 2009 and 2016, and was listed as a Principal of FXCM at relevant times. Niv and Ahdout directed and controlled FXCM's operations at all relevant times, and were responsible, directly or indirectly, for the violations described herein. Defendants FXCM, FXCM Holdings, Global, Niv and Ahdout are hereinafter sometimes collectively referred to as "Defendants".

## FACTS UNDERLYING THE ACTION

### I. FXCM'S PURPORTED AGENCY TRADING MODEL

9.  From September 4, 2009 through at least 2014, FXCM, by and through its officers, employees, and agents, including Niv and Ahdout, engaged in false and misleading solicitations of FXCM's retail foreign exchange ("forex") customers, including Plaintiff and the Class (as further defined below). On information and belief, Defendants also systematically disadvantaged the trades of FXCM's retail forex customers, including Plaintiff and the Class, by effectively taking positions opposite those of FXCM's retail customers and engaging in numerous deceptive and abusive execution activities that were designed to benefit FXCM, to the detriment of its retail forex customers.

10. FXCM represented to its retail customers that when they traded forex on FXCM's "No Dealing Desk" platform, FXCM would have no conflict of interest. According to these representations, retail customers' profits or losses would be irrelevant

3

to FXCM's bottom line, because FXCM's role in the customers' trades was merely as a credit intermediary. According to FXCM, customer trades would be directed to banks and other independent "market makers" that provided liquidity to the platform.

11. Contrary to these representations, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – Effex Capital, LLC ("Effex")- and thus was taking positions opposite FXCM's retail customers. Effex was an FXCM-backed startup firm that was founded by a former FXCM executive, John Dittami ("Dittami"), while he was working at FXCM, that operated for the first year of its existence out of FXCM's offices, and that shared most of its trading profits with FXCM.

12. FXCM also made false statements to National Futures Association ("NFA") staff, in order to conceal FXCM's role in the creation of Effex as well as Dittami's previous role as an FXCM executive.

13. FXCM, which was founded in 1999 and became a registered FCM in 2001, provides retail customers access to over-the-counter forex markets through a proprietary technology platform, and acts as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. As of July 31, 2016, FXCM had over 20,000 active retail customer accounts representing more than $170 million in liabilities.

14. Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal dealing desk - a division of FXCM that determined the prices offered to customers and held positions opposite customers. This "dealing desk" model is similar to the models employed by the only two other CFTC-

registered RFEDs authorized to operate in the United States- Gain Capital Group, LLC and Oanda Corp.

15.  In or around 2007, FXCM transitioned from utilizing a dealing desk to transact with customers to using what it termed an "agency" model for the majority of its retail forex customers, which it described to customers as providing "No Dealing Desk" forex trading.

16.  Whereas a dealing desk broker "acts as a market maker" and "may be trading against your position," FXCM claimed that its agency model "eliminat[ed]" that "major conflict of interest" between broker and retail customer. In FXCM's agency model, price quotations were provided not by FXCM's internal dealing desk but by banks and other third-party "market makers" - sometimes also referred to as "liquidity providers" or "LPs."

17.  FXCM explained its agency model to its customers as follows: "When our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker."

18.  FXCM claimed that trading on its agency model was different from a dealing desk broker because: "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses."

II.  CONTRARY TO ITS REPRESENTATIONS, FXCM EFFECTIVELY TRADES OPPOSITE ITS CUSTOMERS AS A PRINCIPAL VIA EFFEX

19.  In 2009, Niv, Ahdout, and others at FXCM formulated a plan to create an algorithmic trading system - an FXCM computer program that could make markets to

5

FXCM's customers and thereby either replace or compete with the independent market makers on FXCM's No Dealing Desk platform.

20. Niv and Ahdout hired a high-frequency trader, John Dittami, to a Managing Director position at FXCM. Dittami's employment agreement, signed by Dittami and Ahdout, provided that FXCM would pay Dittami a base salary plus a bonus of 30 percent of trading profits generated by his algorithmic trading system, with FXCM keeping the remaining 70 percent.

21. Dittami began working for FXCM on October 5, 2009 and ultimately developed the algorithmic trading system for FXCM.

22. In early 2010, when Dittami was finalizing his trading algorithm, FXCM's compliance department raised concerns that trading against FXCM retail customers might contradict FXCM's marketing statements about its No Dealing Desk model.

23. In response to these concerns, FXCM determined that Dittami would form his own company and operate as an "external" liquidity provider for FXCM. On March 23, 2010, Dittami formed his new company, Effex. On April 14, 2010, Dittami resigned from FXCM. Dittami and FXCM agreed that Dittami's resignation would not change the economic relationship between FXCM and Dittami, including Dittami's retention of 30 percent of his trading profits, with FXCM receiving the other 70 percent.

24. On March 1, 2010, Effex and FXCM entered into a services agreement (later superseded by a May 1, 2010 services agreement) providing that Effex would make monthly payments to FXCM in the amount of $21.00 per million dollars of trading volume executed- a sum intended to equal approximately 70% of Effex's profits from the customer trading channeled to Effex by FXCM.

6

25. To help launch Effex's operations, FXCM gave Effex a $2 million interest-free loan, and allowed Effex to use FXCM's prime broker through a "prime of prime" account. When Dittami resigned from FXCM, he continued working from FXCM's offices, rent free, and continued to operate Effex out of FXCM's offices in New York City until approximately April 2011.

26. FXCM then allowed Effex what amounted to a right of first refusal on trades from FXCM's retail forex customers. Due to the preferential treatment that it received, Effex captured over 50% of FXCM's daily order flow at relevant times.

27. This order flow proved highly profitable both for Effex and FXCM. Between 2010 and 2014, Effex rebated approximately $77 million in trading profits to FXCM- presumably keeping over $30 million for itself.

28. From 2010 to 2014, no market maker besides Effex paid FXCM for order flow.

29. Notwithstanding the formal documentation of the monthly payments from Effex reflecting a fixed $21.00 fee per million dollars of "aggregated volume of Transactions executed," in reality the payments represented Effex and FXCM's agreement to share profits derived from Effex's trading against FXCM's retail customers. When spreads tightened and Effex's profits dropped to considerably less than $30 per million in trading, FXCM and Effex amended their services agreement to continue their 70/30 split of the profits generated by Effex's trading against FXCM retail forex customer orders.

30. In addition to favoring Effex over other market makers, FXCM allowed Effex to use a hold timer that enabled Effex to execute a trade at the start or end of a hold

7

timer period, whichever was better for Effex. In late 2011 and 2012, Effex continued to make use of a hold timer but would accept or reject the trade based on the price at the end of the hold timer period.

31.  Effex also made use of a practice under which Effex submitted a quote to FXCM and FXCM would respond with an execution request based on the trading limits contained in a customer limit order and not the previous quote provided by FXCM.

### III. FXCM MADE MISREPRESENTATIONS TO CUSTOMERS AND REGULATORS THAT WERE DESIGNED TO CONCEAL ITS TRADING OPPOSITE RETAIL CUSTOMERS

32.  The foregoing trading practices were not disclosed by, and in fact were actively concealed by, FXCM and its personnel. As of October 2010, FXCM's website promised "No conflict of interest between broker and trader" and "No dealer intervention in trades," stating that "[e]very trade is executed back to back with one of the world's premier banks or financial institutions, which compete to provide FXCM with bid and ask prices." This representation was false and misleading because, in fact, numerous FXCM customer trades were executed not via "premier banks or financial institutions" competing with bid and ask prices, but through Effex, which was granted an effective right of first refusal on FXCM customer trades.

33.  FXCM did not disclose that its principal market maker, Effex, was a startup firm spun off from FXCM and that FXCM shared in Effex's profits. For example, FXCM's website implied that its market makers were institutions independent of FXCM, stating as follows: "[W]e have obtained close banking relationships with some of the world's largest and most aggressive price providers." The website continued: "FXCM does not take a market position - eliminating a major conflict of interest. A

8

dealing desk broker, which acts as a market maker, may be trading against your position. However, with our No Dealing Desk execution, we fill your orders from the best prices available to us from the banks."

34. FXCM also misled regulators about its relationship with Effex. In connection with NFA's 2013 examination of FXCM, NFA compliance staff met with FXCM executives in Chicago on October 24, 2013. In response to NFA's questions about FXCM's relationship with Effex, Niv omitted to mention any of the details described above concerning FXCM's relationship with Effex. Instead, Niv misrepresented that he had a prior working relationship with Dittami from when Dittami was a trader employed by other liquidity providers.

35. Members of FXCM's compliance department also made a series of misstatements to NFA. On October 22, 2013, two days before FXCM's meeting with NFA, an FXCM compliance officer told NFA in an email: "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients ... ." Given, among other things, FXCM's interest in and profit-sharing arrangement with Effex, this statement was false.

36. After NFA sought clarification of this statement, asking FXCM to "provide representation as it relates to owners, principals, APs [associated persons], employees, and affiliates of FXCM," another compliance officer compounded FXCM's previous misrepresentation in a March 24, 2014 email: "To my knowledge, there are no present or past owners, principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model." This statement was not true

9

because (among other reasons) Dittami, the 100% owner of Effex, was a former employee and executive of FXCM.

## IV. PLAINTIFF AND THE CLASS WERE HARMED BY DEFENDANTS' FRAUDULENT STATEMENTS AND TRADING PRACTICES

37. Plaintiffs and other retail forex customers of FXCM were harmed by Defendants' false and misleading statements concerning the purported "no dealing desk" model, as well as unfavorable trade executions that resulted from FXCM's routing of customer trades to Effex and the execution practices engaged in by Effex and permitted by FXCM.

38. NFA's investigation found evidence that FXCM's senior executives, Niv and Ahdout, approved Effex's use of execution practices that denied customers the benefit of positive price improvement and resulted in asymmetrical price slippage.

39. Effex engaged in execution practices that deprived FXCM's customers of positive price improvement while giving customers negative price slippage. This detriment to customers resulted from Effex's use of two execution tactics that Effex employed- known as "Hold Timer" and "Previous Quote"- that FXCM approved of and permitted Effex to utilized in a manner detrimental to customers.

40. Through an abusive use of the practice known as "last look", Effex imposed a hold period between the receipt of a customer order and the acceptance or rejection of the order, which process FXCM and Effex employees referred to as a "Hold Timer." During this hold period- which was milliseconds in duration- Effex would compare the price of the customer's order at the start of the hold timer against the prevailing price at the end of the hold timer. In cases where the price at the end of the

hold timer had moved against Effex and in favor of the customer, Effex would reject the trade.

41. On the other hand, if the price had moved in favor of Effex and against the customer, Effex would execute the trade and give the customer negative price slippage.

42. For a time, Effex used a particularly egregious version of Hold Timer where the firm would hold market orders for a preset period and then execute the order at a price beneficial to Effex, and to the detriment of FXCM's customers. Through this practice, Effex's system would hold the order, review the prices that existed at the beginning and end of the hold timer, and then fill the order at whichever price was more favorable to Effex.

43. FXCM employees assigned to provide trade support to Effex actively participated in this practice, setting and adjusting the hold timer on Effex's behalf.

44. The other abusive execution tactic that Effex used was known as "Previous Quote." FXCM shared trade data with Effex, including the price that would trigger the execution of a customer's order (the "Tagged Price"). Effex then used this information to decide whether to execute the trade at its previously-quoted bid (or offer) or at the Tagged Price, choosing the price that was more favorable to Effex and which deprived the customer of favorable price improvement.

45. NFA found evidence suggesting that Effex used the Previous Quote tactic numerous times during 2010 to deny customers the benefit of favorable price improvement.

## CLASS ALLEGATIONS

46. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").

47. The Class in this action ("Class") consists of all persons, other than Defendants, their employees, affiliates and agents, who executed retail Forex trades through an account maintained at FXCM between January 1, 2010 and December 31, 2016 ("Class Period").

48. At least thousands of persons are believed to be members of the putative Class, and those persons or entities are geographically dispersed. Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

49. Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).

50. Common issues of law and fact include but are not limited to:

(i) whether Defendants made false and misleading statements to Plaintiff and the Class;

(ii) whether Defendants engaged in or assisted fraudulent trade execution practices;

(iii) whether Defendants' conduct violated the Commodity Exchange Act ("CEA");

(iv) whether Defendants breached their customer agreements with Plaintiff and the Class and whether Defendants breached the implied covenant of good faith and fair dealing stemming from those agreements;

(v)   whether Defendants were unjustly enriched at the expense of Plaintiff and the Class;

(vi)   whether a constructive or actual trust should be impressed upon the ill-gotten gains obtained by Defendants as fruits of their misconduct; and

(vii)   the sum of Plaintiff's and the Class's damages.

51.   Plaintiff's interests are typical of, and not antagonistic to the interests of, the Class.

52.   Plaintiff has retained competent counsel experienced with class actions and commodities litigation and intends to vigorously prosecute this action.

53.   Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Indeed, a class action is the only method by which Plaintiff and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.

54.   The size of individual damages is small in comparison to the complexity and scope of the Defendants' alleged unlawful conduct.

55.   Plaintiff does not anticipate any difficulties in the management of this action as a class action.

### AS AND FOR A FIRST CAUSE OF ACTION FOR VIOLATION OF THE COMMODITY EXCHANGE ACT SECTION 4b(a)(2) and REGULATION 5.2(b)

56.   Plaintiff incorporates and re-alleges each of her previous allegations as though fully set forth herein.

57.   Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A) and (C), provide, in relevant part, that it is unlawful for any person, in or in connection with any

order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in connection with such contract.

58. Pursuant to Section 2(c)(2)(C)(iv) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iv), Section 4b of the CEA applies to any retail forex agreement, contract, or transaction described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i), as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery.

59. Regulations 5.2(b)(l) and (3), 17 C.F.R. §§ 5.2(b)(1) and (3), provide, in pertinent part, that it shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (l) to cheat or defraud or attempt to cheat or defraud any person; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

60. Section 13(a)(5) of the CEA makes it unlawful for any person to willfully violate any other section of the CEA or any regulation promulgated thereunder.

61. Defendants have violated Section 4b(a)(2) and /or Section 13(a)(5) of the Commodity Exchange Act by virtue of the course of conduct alleged herein.

62. Plaintiff and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST DEFENDANTS FXCM, FXCM HOLDINGS AND GLOBAL FOR
## VICARIOUS LIABILITY UNDER CEA SECTION 2(a)(1)

63. Plaintiff incorporates and re-alleges each of her previous allegations as though fully set forth herein.

64. Defendants FXCM, Niv and Ahdout have engaged in primary violations of the CEA, including without limitation Section 4b(a)(2) and /or Section 13(a)(5), by virtue of the course of conduct alleged herein.

65. Defendants FXCM, Niv and Ahdout, was/were acting for and/or as agent(s) of Defendants FXCM, FXCM Holdings, and Global. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), such Defendants are liable for the acts of their agents or another person acting for them.

66. Plaintiff and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST
## DEFENDANTS GLOBAL, FXCM HOLDINGS, NIV AND AHDOUT
## FOR CONTROL PERSON LIABILITY UNDER CEA SECTION 13(b)

67. Plaintiff incorporates and re-alleges each of her previous allegations as though fully set forth herein.

68. Defendants Niv and Ahdout were the principals of Defendant FXCM at all relevant times. Defendants FXCM Holdings and Global were the direct and indirect owners, respectively of Defendant FXCM and were also effectively controlled by Defendants Niv and Ahdout.

69. As such, Defendants Niv, Ahdout, FXCM Holdings and Global directly or indirectly controlled Defendant FXCM, which violated the CEA by virtue of the course of conduct alleged herein.

70. As controlling persons, Defendants Niv, Ahdout, FXCM Holdings and Global are liable under Section 4(b) of the Commodity Exchange Act, 7 U.S.C. § 6(b) pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

71. Plaintiff and the Class are each entitled to actual damages from Defendants Niv, Ahdout, FXCM Holdings and Global by virtue of such control person liability.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT FXCM FOR BREACH OF CONTRACT

72. Plaintiff incorporates and re-alleges each of her previous allegations as though fully set forth herein.

73. Plaintiff and other Class Members entered into uniform contracts with FXCM in connection with opening customer accounts.

74. Defendant FXCM breached the contractual obligations owed to Plaintiff and the Class by virtue of the course of conduct alleged herein. Specifically, Defendant FXCM breached its contract with Plaintiff and other Class Members by surreptitiously trading against Plaintiff and other Class Members, its own customers.

75. As such, Defendant FXCM failed to faithfully execute Plaintiff and the Class's retail forex trades, as it had contracted to do.

76. Plaintiff has done all, or substantially all of the significant things that she was required to do under her contract with FXCM, or was excused from having to do those things.

77. All conditions required for the performance by Defendant FXCM of its obligations had occurred.

78. As a direct and proximate result of Defendant FXCM's contractual breaches, Plaintiff has been damaged in an amount to be ascertained at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT FXCM FOR BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

79. Plaintiff incorporates and re-alleges each of her previous allegations as though fully set forth herein.

80. Plaintiff and other Class Members entered into uniform contracts with FXCM in connection with opening customer accounts.

81. Implied into every contract is an obligation by the contracting parties to act in good faith and to deal fairly with each other, such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

82. Defendant FXCM breached its implied obligation to act in good faith and deal fairly with customers, owed to Plaintiff and the Class, by virtue of the course of conduct alleged herein. Specifically, Defendant FXCM breached this duty by surreptitiously trading against Plaintiff and other Class Members, its own customers.

83. As such, Defendant FXCM failed to faithfully execute Plaintiff and the Class's retail forex trades, and otherwise failed to act in good faith in the performance of its agreements with customers.

84. Plaintiff has done all, or substantially all of the significant things that she was required to do under her contract with FXCM, or was excused from having to do those things.

85. All conditions required for the performance by Defendant FXCM of its obligations had occurred.

86. As a direct and proximate result of Defendant FXCM's breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be ascertained at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS FXCM HOLDINGS, GLOBAL, NIV AND AHDOUT FOR UNJUST ENRICHMENT

87. Plaintiff incorporates and re-alleges each of her previous allegations as though fully set forth herein.

88. This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

89. Defendants have received a benefit from Plaintiff and Class members in the form of the commissions and fees Plaintiff and the Class members paid for to Defendants in connection with retail forex trades executed by FXCM, as well as illicit profits obtained by Defendants via the trade execution practices described above.

90. Defendants are aware of their receipt of the above-described benefit.

91. Defendants received the above-described benefits to the detriment of Plaintiff and other members of the Class.

92. Defendants continue to retain the above-described benefit to the detriment of Plaintiff and the Class members.

93. As a result of Defendants' unjust enrichment, Plaintiff and Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution.

## FRAUDULENT CONCEALMENT

94. Defendants concealed the wrongful conduct alleged herein. Plaintiff only recently discovered the true facts concerning Defendants' violations, and could not have discovered them and brought legal action sooner in the exercise of reasonable diligence.

95. Due to this fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff have been tolled during the period of such fraudulent concealment.

## JURY DEMAND

96. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

(a) Ordering that this action proceed as a class action as to all claims previously alleged;

(b) awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial;

(c) awarding attorneys' fees and costs;

(d) impressing a trust on the ill-gotten gains of Defendants in the ultimate res of which each Class member shall have an undivided interest;

(e) disgorging sums by which Defendants have been unjustly enriched;

(f) directing further proceedings to determine the distribution of the trust among Class members, inter se, and award attorneys' fees and expenses to Plaintiffs' counsel; and

(g) granting such other and further relief as this Court shall deem just and proper.

Dated:   New York, New York
         May 16, 2017

        LAW OFFICE OF
        CHRISTOPHER J. GRAY, P.C.

        By: _____
        Christopher J. Gray
        Michael J. Giarrusso
        360 Lexington Avenue, 14th$^t$ Floor
        New York, New York 10017
        (212) 838-3221
        (212) 937-3139 (fax)
        chris@investorlawyers.net

Of Counsel:

WHITE LAW GROUP, LLC
D. Daxton White, Esq.
205 West Randolph Street, Ste. 1200
Chicago, IL 60606
(312) 238-9650
(312) 238-8950 (fax)
dax@whitesecuritieslaw.com

*Counsel for Plaintiff*